IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL W. MCDONALD,　　　　　)　　CASE NO. 5:25-CV-01527-CAB
　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　JUDGE CHRISTOPHER A. BOYKO
　　　　vs.　　　　　　　　　　 )　　UNITED STATES DISTRICT JUDGE
　　　　　　　　　　　　　　　　)
COMMISSIONER OF SOCIAL SECURITY,  )　　MAGISTRATE JUDGE
　　　　　　　　　　　　　　　　)　　JONATHAN D. GREENBERG
　　　　　Defendant.　　　　　　)
　　　　　　　　　　　　　　　　)　　**REPORT AND RECOMMENDATION**
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)

Plaintiff, Michael W. McDonald ("Plaintiff" or "McDonald"), challenges the final decision of Defendant, Frank J. Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

In January 2023, McDonald filed an application for POD and DIB, alleging a disability onset date of April 1, 2020 and claiming he was disabled due to depression, anxiety, memory issues, blood clots, vertigo, migraines, and right knee issues.  (Transcript ("Tr.") 63, 73, 74, 84.)  The applications were denied

---

[1] On May 7, 2025, Frank J. Bisignano became the Commissioner of Social Security.

initially and upon reconsideration, and McDonald requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 90, 95, 98.)

On May 30, 2024, an ALJ held a hearing, during which McDonald, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 32-62.)  On June 14, 2024, the ALJ issued a written decision finding McDonald was not disabled.  (*Id*. at 15-27.)  The ALJ's decision became final on May 27, 2025, when the Appeals Council declined further review.  (*Id*. at 1.)

On July 23, 2025, McDonald filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos.8, 10, 11.) McDonald asserts the following assignments of error:

1. The ALJ Erred at Step Five (5) by Finding Other Occupations Available Under the Final RFC.

2. The ALJ Erred by Failing to Properly Account for the State Agency Reviewing Psychological Consultants' Opinions.

(Doc. No. 8 at 8, 12.)

## II. EVIDENCE

### A.      Personal and Vocational Evidence

McDonald was born in 1971 and was 52 years-old at the time of his administrative hearing (Tr. 63, 38), making him a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  He has a high school education.  (*Id*. at 38.)  He has past relevant work as a cabinetmaker.  (*Id*. at 54.)

**B.      Relevant Medical Evidence[2]**

On April 14, 2021, McDonald underwent an ultrasound of the left leg. (*Id*. at 498.) Results revealed no evidence of thrombosis in the visible deep veins of the left leg and thrombosis in the lesser saphenous vein of the superficial venous system. (*Id*.)

On April 22, 2021, McDonald presented for an office visit. (*Id*. at 487.) He started medication to treat deep vein thrombosis. (*Id*.)

On May 4, 2021, McDonald presented for "INR check." (*Id*. at 476.) The provider's plan included long-term use of anticoagulant therapy. (*Id*. at 477.)

On September 28, 2021, McDonald presented for a primary care pharmacy visit to address type 2 diabetes. (*Id*. at 472.)

On July 26, 2022, McDonald presented for an Initial Psychiatric Evaluation. (*Id*. at 570; 387.) He reported feeling on the verge of a nervous breakdown, forgetting to reschedule appointments, poor medication adherence, and "down" mood. (*Id*. at 570-71.) He was alert and oriented, appeared his age, was casually dressed with good grooming and hygiene, behavior was calm and cooperative, he had good eye contact, normal psychomotor activity, and his thoughts were logical, goal directed, and coherent. (*Id*. at 387.)

On August 10, 2022, McDonald presented for an office visit. (*Id*. at 384.) The provider's assessment noted type 2 diabetes was uncontrolled due to poor compliance and long-term use of anticoagulant therapy. (*Id*. at 385.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On August 23, 2022, McDonald presented for an office visit for anxiety and depression. (*Id*. at 324.) He reported better adherence with medications. (*Id*.) He rated his depression a "5" out of ten and anxiety an "8" out of ten. (*Id*.)

On September 20, 2022, McDonald presented for a follow up visit. (*Id*. at 378.) He reported still experiencing depression and anxiety. He stated he is unable to do good work when he is around others due to his anxiety, and that he was looking forward to a trip with his wife that weekend to Put-In-Bay. (*Id*.)

On September 23, 2022, McDonald presented for a primary care pharmacy visit to address type 2 diabetes. (*Id*. at 309.) He reported doing well and continuing to work on medication adherence. (*Id*.)

On October 14, 2022, McDonald presented for a primary care pharmacy visit to address type 2 diabetes. (*Id*. at 301.) He reported doing well and "feels happy" that he is seeing improvement in his blood glucose readings. (*Id*.)

On October 28, 2022, McDonald presented for a Behavioral Health Social Work Assessment. (*Id*. at 292.) He reported struggling with depression since childhood, getting poor sleep, and struggling with motivation. (*Id*.) Mental status examination revealed moderate anxiety, depressed mood, fluctuating concentration, poor short-term memory, and was otherwise unremarkable. (*Id*. at 299.) He was diagnosed with major depressive disorder. (*Id*. at 300.)

On November 16, 2022, McDonald presented for an office visit with a social worker. (*Id*. at 363.) He reported feeling more depressed in the colder months. (*Id*.) Mental status examination was normal aside from anxious/nervousness and depressed mood. (*Id*.)

On January 1, 2023, McDonald presented to an express clinic with anxiety and panic attacks due to running out of his anxiety medications. (*Id*. at 340.) His medication was refilled for seven days. (*Id*. at 341.)

On January 11, 2023, McDonald presented for an office visit with his primary care physician. (*Id*. at 336.) He reported daily anxiety that is controlled with medication. (*Id*.) Physical examination was normal. (*Id*. at 337-38.) Referral to psychiatry was deferred due to being stable on medication. (*Id*. at 338.)

On March 21, 2023, McDonald presented for an office visit with his social worker. (*Id*. at 644.) He reported being "not too bad, about the same" and wondered if a head injury sustained as a child could have impacted his learning and cognitive abilities. (*Id*.) Mental status exam was unremarkable aside from depressed mood and anxious/nervousness. (*Id*.) The social worker referred him for a neuropsychological evaluation to assess cognitive challenges. (*Id*. at 646.)

On May 2, 2023, McDonald presented for an office visit with his social worker. (*Id*. at 641.) He reported being "not too bad" and relayed his negative thoughts about himself have not been occurring as often. (*Id*. at 641.) Mental status exam was unremarkable aside from depressed mood and anxious/nervousness. (*Id*.)

On July 18, 2023, McDonald presented for a psychological evaluation. (*Id*. at 619.) He reported feeling down and worthless. (*Id*. at 621.) He reported being able to attend to his daily hygiene, performing household chores, shopping for groceries, and prepare basic meals but has low motivation. (*Id*.) He reported difficulties remembering appointments and medication. (*Id*.) Mental status examination revealed normal appearance, normal speech and thought process, sad mood, no indications of anxiety, some immediate memory issues, and his general level of intelligence appeared to fall below normal limits. (*Id*. at 621-22.) Diagnoses at this time included Major Depressive Disorder. (*Id*. at 623.)

On July 27, 2023, McDonald presented for an office visit with his social worker. (*Id*. at 625.) He stated that he "hates everything about his life" and was tearful while discussing his anger issues and depression. (*Id*.) Mental status exam was unremarkable aside from depressed mood and anxious/nervousness. (*Id*.)

On May 8 and 25, 2023, McDonald presented for an assessment of neurocognitive functions by a psychologist. (*Id*. at 631.) He was diagnosed with "Unspecified Neurocognitive Disorder, Disorder of Written Expression; Major Depressive Disorder, recurrent, moderate; Generalized Anxiety Disorder; Specific Learning Disorder with impairment in written expression." (*Id*. at 632.)

On October 20, 2023, McDonald presented for an office visit with his social worker. (*Id*. at 743.) He reported struggling in the past with the change in seasons and feeling uncomfortable while attending a class reunion. (*Id*. at 744.) Mental status exam was unremarkable aside from depressed mood and anxious/nervousness. (*Id*.)

On December 11, 2023, McDonald participated in an initial psychiatric evaluation at the referral of his social worker. (*Id*. at 754.) He expressed symptoms of depression and anxiety, financial stress, and that his medications are "too much." (*Id*. at 755.) Mental status exam was normal except for anxious mood. (*Id*. at 758.) Diagnoses at this time include moderate major depressive disorder and anxiety disorder. (*Id*. at 759.) The provider adjusted his medications. (*Id*.)

On February 14, 2024, McDonald presented for a follow up visit. (*Id*. at 871.) He reported stopping a medication after it was discontinued by his provider, but started taking it again a week later. (*Id*.) He feels anxiety is high at his new job, causing him to make mistakes. (*Id*.) He reported his depression is ongoing and unchanged. (*Id*.) He reported not monitoring his glucose levels and not taking insulin with meals. (*Id*.) Mental status exam was normal aside from limited insight. (*Id*. at 874-75.)

On March 5, 2024, McDonald presented for a follow up visit. (*Id*. at 813.) He reported, "It's coming together just not as fast as I would like." (*Id*.) He reported starting a new job and struggling with change, motivation, and energy. (*Id*. at 814.) His depression was noted as moderate but slightly improved. (*Id*.) He was encouraged to take his medications as prescribed. (*Id*. at 818.)

## C.    State Agency Reports

### 1.    Mental Impairments

On September 5, 2023, Robert Baker, Ph.D., reviewed the claim file and opined that McDonald had no understanding or memory limitations, was not significantly limited in his ability to carry out very short and simple instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual, sustain an ordinary routine, and make simple work-related decisions. (*Id.* at 69-70.) Dr. Baker found McDonald was moderately limited in his ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace. (*Id.* at 70.) Dr. Baker found McDonald is not significantly limited in his ability to ask simple questions and request assistance, and his ability to maintain socially appropriate behavior. Dr. Baker found he is moderately limited in his ability to interact appropriately with the general public, ability to accept instruction and respond appropriately to criticism, and get along with coworkers or peers. (*Id.* at 70.) Dr. Baker wrote McDonald is moderately limited in his ability to respond appropriately to changes in the work setting. (*Id.*)

On November 5, 2023, on reconsideration, Kevin Edwards, Ph.D., affirmed the findings of Dr. Baker. (*Id.* at 81.)

### 2.    Physical Impairments

On July 14, 2023, Venkatachala Sreenivas, M.D., reviewed the claim file and opined that McDonald could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, had no limitation in pushing or pulling with upper extremities, and was limited in pushing and pulling in his lower extremities. (*Id.* at 68.) Dr. Sreenivas opined he could stand or walk and sit about six hours in an eight-hour workday. (*Id.*) Dr. Sreenivas stated he could frequently climb ramps and stairs, never climb ladders, ropers or

7

scaffolds, could unlimitedly balance and stoop, and occasionally kneel, crouch, and crawl. (*Id*.) Dr. Sreenivas found McDonald had no manipulative, visual, or communicative limitation. (*Id*. at 69.) Dr. Sreenivas thought he should avoid all exposure to hazards, but otherwise had no other environmental limitations. (*Id*.)

On November 6, 2023, on reconsideration, W. Scott Bolz, M.D., affirmed Dr. Sreenivas' findings. (*Id*. at 80.)

**D.    Hearing Testimony**

During the May 30, 2024 hearing, McDonald testified to the following:

> • He is currently working as a cabinet maker. (*Id*. at 39.) He works about 32 hours per week. (*Id*.) He does not have any special accommodations. (*Id*.) He has worked as a cabinet maker for the past fifteen years or so. (*Id*.) He has called off work about fifteen time since he started in January. (*Id*. at 48.) At his job he is able to lift and carry about twenty pounds. (*Id*. at 39-40.) He cannot work a full-time job because he cannot concentrate and his "anxiety just skyrockets" when someone tells him to do something and he doesn't understand what they are saying. (*Id*. at 40.) His depression and anxiety keep him from going into work. (*Id*.) He has suffered from depression and anxiety since the sixth grade. (*Id*.) He is taking medications for it, and "they've helped a good bit." (*Id*. at 41.) He also takes blood thinners and medication for diabetes. (*Id*.) The medications cause dizziness when he bends over. (*Id*.) Therapy helps, and he attends about once per month. (*Id*. at 42.) He sees a medication manager to work on adjusting dosages of his medication. (*Id*. at 50.) His long-term memory is fine, but he has a problem with short term memory. (*Id*. at 42.) He has trouble staying focused on tasks and finishing projects. (*Id*.) He has trouble getting to know people and has no friends. (*Id*. at 43.)
>
> • He has problems with his right knee. (*Id*. at 43.) He cannot kneel down, has a hard time walking, and "can't carry nothing on that knee." (*Id*.) He has arthritis in his knees which causes difficulty. (*Id*. at 52.) He is on blood thinners due to pulmonary embolisms in the past. (*Id*. at 44.) He has to be careful with what he is doing because the blood thinners make it hard to heal from cuts. (*Id*.) He experiences migraine headaches about five times per year and "it's not really too bad." (*Id*.) He is on medications for diabetes, but he can't get the diabetes under control. (*Id*.) When his blood sugar is low, he feels dizzy. (*Id*. at 45.) He can stand about an hour if he is not putting pressure on his right leg. (*Id*.) He thinks he can lift about twenty to thirty pounds but "can't carry nothing" because of his knee. (*Id*.) He has no issues

8

walking if it is at a slow pace. (*Id.*) He has no problems with his hands, but his elbows don't bend all the way. (*Id.* at 46.) He has no problems using power tools. (*Id.*) He does not think he could get up and down a flight of stairs. (*Id.*) He has sleep apnea. (*Id.*)

• He lives with his wife. (*Id.* at 47.) She handles household chores; except he can mow the grass with a zero-turn mower. (*Id.*) He does not have problems driving or grocery shopping. (*Id.*) He does not have any hobbies. (*Id.*) He used to like riding his motorcycle and working on a Corvette, but he sold it due to depression. (*Id.*) His depression was so bad a couple of weeks ago that he called off work and sat in his car in the parking lot of a psyche ward. (*Id.* at 47-8.) He sat in the parking lot for two hours and did not go in. (*Id.* at 48.) His wife handles paying bills. (*Id.* at 49.) On days he is not working he sleeps in until noon and plays on his phone. (*Id.* at 50.) He has hygiene problems and hasn't showered in about three months and has not brushed his teeth in a year. (*Id.*) He uses his phone to remind him of appointments or he will forget. (*Id.* at 51.) His wife has to encourage him to do chores like taking out the trash. (*Id.*)

The VE testified McDonald had past work as a cabinet maker.  (*Id.* at 54.)  The ALJ then posed the following hypothetical question:

> Please respond to whether or not the hypothetical person could perform the Claimant's past work, how he performed that work, how that work is generally performed in the national economy.  For the first hypothetical, please assume a person of the same age, education, work experience as the Claimant.  The person is limited to light work.  The person can lift up to 20 pounds occasionally, 10 pounds frequently.  The person can sit, stand, and walk for six hours in an eight-hour day.  Pushing and pulling is the same as lift and carry.  The person is unable to climb ladders, ropes, or scaffolds. The person can occasionally climb ramps and stairs.  The person can occasionally balance, stoop, kneel, crouch, and crawl.  The person is limited to occasional overhead reaching.  The person must avoid all exposure to hazards, such as unprotected heights and dangerous moving machinery.  The person has the concentration, persistence, and pace to perform simple and routine tasks.  The person's unable to perform fast paced production rate pace work, for example assembly line work, or jobs that require specific hourly production quotas.  The person's unable to perform tandem tasks. The person's limited to no public interaction. The person's limited to occasional interaction with co-workers and supervisors. The person is limited to occasional changes in a routine work setting. Could such a person perform the cabinet maker job?

(*Id.* at 55-56.)

9

The VE testified the hypothetical individual would not be able to perform McDonald's past work as a cabinet maker.  (*Id*. at 56.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cleaner/housekeeping, inspector/hand packager, and merchandise marker. (*Id*.)  The ALJ asked, "For my next hypothetical, please assume a person of the same age, education, and work experience as the Claimant. The person is limited to sedentary work, same non-exertional limitations as Hypothetical 1. Past work still ruled out. Correct?" (*Id*. at 57.) The ALJ confirmed past work was still ruled out. (*Id*.) The VE explained that twenty percent or greater time spent off task precludes competitive performance, and employers typically tolerate no more than one day absent per month on an ongoing basis. (*Id*.)

During examination of the VE by Plaintiff's counsel, the following exchange occurred:

Q: Okay. And then with respect to these unskilled positions that you testified about in general, is there a provisionary or training period that these individuals must go through in order to be able to learn or understand the prophecies of the job?

A: All of these jobs are simple, unskilled work, explained either through short demonstration, or simple verbal instructions. I look at the jobs being learned within 30 days, so I guess if you wanted to think about probation, you know, two weeks to 30 days to do the job. Sometimes -- and some of these jobs, like the inspector, it's a visual demonstration. You know it that day.

Q: Okay. Now are employers typically less tolerant during this stage, during this period?

A: I find employers are generally less tolerant to absenteeism.

Q: Okay. All right. So then with respect to that, would it be that if they missed one day during this time period, would that be considered enough to terminate their position then?

A: I can't say for any particular employer. When I looked at the literature, absenteeism tends to run from three days to 14 days a year overall, through a variety of industries. I find the median number is six to seven days. You know, there are so many variables. If a person comes in and they're working well, and then they catch the flu, and they're out three days, would that employer necessarily terminate them? I don't know. Some employers, I find it in manufacturing, are very strict. They are the ones at three days. So if you're

10

already missing one day in the first 30 days, you may not maintain employment. Most employment is at will, so the employer can terminate you at any point.

Q: Okay. You mentioned, in order to learn a lot of these jobs, it's a short demonstration. Even despite that short demonstration, are employees still going to be experiencing frequent and/or ongoing contact during that demonstration or the probationary period?

A: Well, I find that supervisors tend to track more frequently on the person performing the job, just to make sure that things are appropriate and going well.

(Id. at 58-60.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has

11

a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, McDonald was insured on the alleged disability onset date, April 1, 2020, and remains insured through December 31, 2025, the date last insured ("DLI"). (Tr. 63.) Therefore, in order to be entitled to POD and DIB, McDonald must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2. The claimant engaged in substantial gainful activity during the following periods: January 1, 2024 to the present (20 CFR 404.1520(b) and 404.1571 et seq.).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairments: depression, diabetes mellitus, migraines, obstructive sleep apnea, anxiety disorder, residuals of

12

deep vein thrombosis and pulmonary embolism, degenerative joint disease of the right knee (20 CFR 404.1520(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations. The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can occasionally reach overhead. The claimant must avoid all exposure to hazards such as unprotected heights and dangerous moving machinery. The claimant has the concentration, persistence and pace to perform simple and routine tasks. The claimant is unable to perform fast paced production rate pace-work (i.e. assembly line work or jobs that require specific hourly production quotas). The claimant is unable to perform tandem tasks. The claimant is limited to no public interaction. The claimant is limited to occasional interaction with coworkers and supervisors. The claimant is limited to occasional changes within a routine work setting.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8. The claimant was born on December 18, 1971 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

9. The claimant has at least a high school education (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

12. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2020, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-26.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice"

14

within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A. Step Five.

In his first assignment of error, McDonald argues the ALJ limited him to occasional interaction with coworkers and supervisors at step four, yet the VE testified that the training/provisionary period for even unskilled work results in supervisors "tracking" more frequently on the new hire, resulting in greater than occasional interaction which is inapposite of the RFC finding. (Doc. No. 8 at 9-10.)

15

In response, the Commissioner argues the VE did not testify that the jobs required more than occasional interaction with supervisors, only that the unskilled jobs required "short demonstration, or simple verbal instructions." (Doc. No. 10 at 8.) The Commissioner asserts a "short demonstration or simple verbal instructions" does not rise to the level of frequent, or more than occasional interaction. (*Id*.) The Commissioner states that even if Plaintiff's argument was accepted, the inspector position training is a visual demonstration that is learned that day, which means there is still a significant number of jobs in the national economy that Plaintiff could perform. (*Id*. at 9.) The Commissioner states the ALJ's findings were "well within the zone of reasonable choices" and remand is not warranted. (*Id*.)

In his reply brief, McDonald argues the record reflects an inconsistency between the RFC's limitation to occasional interaction with supervisors and coworkers and the VE's testimony regarding training requiring more frequent contact. (Doc. No. 11 at 5.)

Here, the ALJ determined McDonald is limited to occasional interaction with coworkers and supervisors. (Tr. 20.) At the hearing, the VE testified that an individual subject to the restrictions the ALJ ultimately included in the RFC can perform work in three unskilled positions: cleaner/housekeeper, inspector/hand packager, and merchandise marker. (*Id*. at 56.) On cross examination, the VE testified that employees in unskilled occupations are trained for two weeks to 30 days, during which they may have more frequent interaction with supervisors. (*Id*. at 58-60.) The VE explained that some positions, like inspector, require only a short demonstration for training. (*Id*. at 59.) The ALJ relied on the VE's testimony that a claimant subject to the restrictions identified in the RFC could perform work as a housekeeping cleaner, inspector hand packager, and merchandise marker. (*Id*. at 25) ("Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.").

The VE was never asked whether the hypothetical individual could make it through the training period of the identified jobs given the heightened contact with supervisors and coworkers that would occur during that period. *See Pamela J. Follen v. Commissioner of Social Security*, No. 5:24-CV-01719-DAC, 2026 WL 1382438, at *4 (N.D. Ohio May 18, 2026), citing *Kenneth P. v. Saul,* No. 4:19-cv-59, 2019 WL 6463449, at *6 (S.D. Ind. Dec. 2, 2019) (reversing ALJ's decision based on error at Step Five because "absent from the VE's testimony is any explicit reconsideration of the hypothetical claimant's ability to perform the representative jobs after the issues of instruction and the probationary period were raised").

This case is analogous to *Follen*, where the Court addressed this exact issue. In *Follen*, the Court wrote:

> The ALJ's conclusion at Step Five is not supported by substantial evidence because it ignores the conflict between Ms. Follen's limitation to occasional interaction with others and the VE's testimony that unskilled occupations require a two-to-three-week training period during which she would have more than occasional interaction interactions with coworkers and supervisors. Though the VE did not testify that a hypothetical individual subject to that limitation could not complete the training period or would be precluded from work if the individual could not complete it, the VE's testimony that a training period typically involves more frequent interaction with others than actually performing the job, the conflict remains. "The ability to complete a training period or probationary period is...tantamount to the ability to keep a job, and as multiple circuits have recognized, the ability to keep a job is a necessary prerequisite to the ability to engage in substantial gainful activity." *Loy v. Comm'r of Soc. Sec.,* No. 5:24-cv-2239, 2025 WL 2611407, at *6 (N.D. Ohio Sept. 10, 2025) (quotation omitted), *report and recommendation adopted,* 2025 WL 3229608 (N.D. Ohio Nov. 18, 2025).
>
> This conclusion is consistent with other persuasive decisions recognizing an ALJ reversibly errs by not reconciling a finding that a claimant can work in the national economy with a VE's testimony that the requirements to complete training or probationary periods exceed the limits of the individual's abilities in the RFC. *McAfee v. Comm'r of Soc. Sec.,* No. 3:19-cv-125, 2020 WL 5810004, at *4 (S.D. Ohio Sept. 30, 2020) (finding substantial evidence did not support the ALJ's decision where the VE testified plaintiff's RFC precluded completing the probationary period); *Otto v. Saul,* No. 3:20-cv-60, 2021 WL 1115351, at *6 (S.D. Ohio Mar. 24, 2021); *Bernard L. v. Saul,* No. 19-cv-1223, 2020 WL 7027637, at *5 (N.D.

17

Ill. Nov. 30, 2020) (finding ALJ erred when she did not resolve the conflict between her finding that the plaintiff's RFC enabled him to work and the VE's testimony that one of plaintiff's limitations jeopardized his ability to complete a job's training period).

*Follen*, 2026 WL 1382438, at *4. Here, as in *Follen*, the ALJ's conclusion at Step Five is not supported by substantial evidence because there is a conflict between McDonald's limitation to occasional interaction with supervisors and coworkers and the VE's testimony that unskilled occupations may have a two week to 30-day training period where supervisors track more frequently.  The VE did not testify that a hypothetical individual subject to that limitation could not complete the training period or would be precluded from work if the individual could not complete it. The reverse is also true; the VE did not testify that a hypothetical individual subject to occasional interaction with supervisors and coworkers could complete the training period.

The RFC is "the most [an individual] can still do despite his limitations. 20 C.F.R. § 404.1545. The ALJ expressly determined McDonald can, at most, interact occasionally with others and gave no indication that McDonald can interact with others more frequently to complete the training period, or whether the training period contact would fall within the definition of occasional interaction. The undersigned recommends finding the Commissioner has not met its burden at Step Five to show McDonald can perform other work in the national economy, and therefore recommends the ALJ's decision be VACATED.

After finding error at Step Five, the Court must decide whether to remand the case for further proceedings or for an award of benefits. McDonald argues the matter should be remanded with instructions to grant benefits. (Doc. No. 8 at 10-12.) A district court may remand the case and order benefits be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. In *Follen*, the Court examined the relevant case law, writing:

18

The Sixth Circuit has not addressed this vocational issue and district courts have reached different conclusions. Some courts addressing the same vocational issue raised here chose to remand the case for an award of benefits. In *McLaughlin v. Comm'r of Soc. Sec.,* No. 3:17-cv-424, 2019 WL 125761 (S.D. Ohio Jan. 8, 2019), *report and recommendation adopted,* 2019 WL 1902749 (S.D. Ohio Apr. 29, 2019), the ALJ determined the plaintiff was limited to occasional interaction with supervisors and coworkers and could not perform duties involving teamwork or shared tasks. *Id.* at *3. On cross-examination, the VE testified a person who could not engage in teamwork or shared tasks could not "weather the probationary period" of the unskilled jobs the VE identified. *Id.* The court found "no 'unresolved inconsistencies' between the VE's testimony and the RFC **and,** because an individual with Plaintiff's RFC could not perform jobs that exist in the national economy, the 'record adequately establishes Plaintiff's entitlement to benefits.'" *Id.* (citing *Faucher,* 17 F.3d at 176).

Similarly, in *Otto*, the ALJ determined the claimant's RFC (including that the claimant could not perform work if subject to "over-the-shoulder supervision") and the VE identified three jobs were available in the national economy that such an individual could perform. 2021 WL 1115351, at *3. The VE then testified that to perform the jobs the VE identified, there would be some over-the-shoulder supervision during a probationary period, but not once the person had learned the job. *Id.* Finally, the VE testified a person who had no tolerance for over-the-shoulder supervision could not complete the required probationary period. *Id.* The court determined there were no factual inconsistencies to be resolved and the record adequately established the plaintiff's entitlement to benefits. *Id.* at *6.

**\*6** And in *Matthew H. v. Comm'r of Soc. Sec.,* No. 3:20-cv-241, 2022 WL 2255376 (S.D. Ohio June 23, 2022), the VE identified a number of unskilled jobs and testified those jobs would require 30 to 90 days of "at least some minimal over the shoulder supervision while the employee was learning to meet the demands of the job and learning the tasks of the job." *Id.* at *5. The court determined the VE's testimony established that "the jobs identified by the vocational expert would not be available to a claimant who, like Plaintiff, cannot be subjected to over the shoulder supervision," and remanded for an award of benefits. *Id.*

But other courts addressing the vocational issue raised here have remanded the case for further proceedings because there unresolved issues of fact remained. In *Bernard L.*, the court remanded because "the VE did not testify whether the jobs at issue were, in fact, entry-level or required a probationary period," thus creating an inconsistency that could be addressed on remand. 2020 WL 7027637, at *6. The court distinguished that case from *McLaughlin,* noting that in *McLaughlin,* "the vocational expert testified unequivocally that a claimant with [the] plaintiff's limitations could not

complete the training or probationary periods for the jobs at issue." *Id.* at *7. The court said there was a "gap in the record" because the VE:

> [D]id not testify that *all* SVP 2 level jobs "require a 30-day training period." Rather, the VE testified that SVP 2 positions in general include a training period "up to 30 days." And while the VE testified that a limitation to only occasional interactions with supervisors and coworkers would preclude a claimant from working in an SVP 2 position that included a thirty-day training period, she did not testify whether that limitation would likewise preclude working in an SVP 2 position with a shorter training period. Nor, finally, did the VE testify about the length of training periods for the small parts assembler, label coder, and housekeeping cleaner positions.

*Id.* at *6 (cleaned up).

> Similarly, in *Bassett v. Comm'r of Soc. Sec.,* No. 5:24-cv-1600, 2025 WL 798791 (N.D. Ohio Mar. 13, 2025), *report and recommendation adopted,* 2025 WL 1068013 (N.D. Ohio Apr. 9, 2025), the VE agreed the claimant "would be having more than occasional contact with supervisors while they're being trained," but the claimant's counsel did not ask the VE if a person with those limitations could "weather the probationary period" (or language to that effect) of the three identified jobs. *Id.* at *6. Because it was unclear whether the VE's testimony applied specifically to the three jobs identified for the claimant and the claimant's attorney did not confirm whether this would preclude the claimant from performing the identified jobs, the court concluded those gaps in the record warranted remand for the ALJ's further consideration. *Id.* at *8. Importantly, none of those opinions are binding on this court and serve only as persuasive authority.

*Follen*, 2026 WL 1382438, at *5–6.

The undersigned recommends remanding for further proceedings rather than an award of benefits, as in *Follen*. Here, the VE testified generally regarding training periods for unskilled positions and did not address each of the training periods for the particular jobs she identified, and most critically, whether a person limited to occasional interactions with others could make it through those training periods. Unlike *McLaughlin*, *Otto*, and *Matthew H.,* where the VE testified unequivocally that an individual with those claimants' limitations could not complete the training or probationary periods for the jobs the VEs identified,

20

the record here does not definitively establish that McDonald's RFC precludes him from performing the three unskilled positions identified by the ALJ at Step Five. That is a factual issue for the ALJ to resolve.

As the undersigned recommends remand on these grounds, and in the interest of judicial economy, the undersigned does not reach McDonald's other assignment of error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: June 11, 2026

        *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**